J-S31014-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| RICHARD TRUMPER, JR., | |
| Appellant | No. 1225 MDA 2014 |

Appeal from the Judgment of Sentence Entered June 20, 2014
In the Court of Common Pleas of Union County
Criminal Division at No(s):
CP-60-CR-0000030-2014
CP-60-CR-0000107-2013
CP-60-CR-0000108-2013
CP-60-CR-0000109-2013
CP-60-CR-0000110-2013
CP-60-CR-0000111-2013
CP-60-CR-0000112-2013
CP-60-CR-0000324-2013

BEFORE: BENDER, P.J.E., ALLEN, J., and WECHT, J.

MEMORANDUM BY BENDER, P.J.E.: **FILED JUNE 26, 2015**

Appellant, Richard Trumper, Jr., appeals from the aggregate judgment of sentence of thirty (30) months' to eight (8) years' imprisonment, imposed after he was convicted of numerous counts of theft by deception; bad checks; deceptive business practices – sale of less than the represented quantity of services; theft by deception – false impression; theft by failure to make required disposition of funds; and deceptive business practices in the above-referenced cases. Appellant challenges the sufficiency of the evidence

to sustain his convictions and challenges the sentence imposed by the trial court. We affirm.

In 2012, Appellant was self-employed as a general contractor in Mifflinburg, PA, trading as RTC Custom Home Improvements. N.T. Trial, 4/4/14, at 7. Appellant's business engaged primarily in remodeling and home improvement projects, as well as some new home construction. *Id.* at 9. Following the ceasing of Appellant's business operations in December 2012, and the filing of bankruptcy by Appellant and his wife, multiple criminal charges were brought against Appellant under eight different docket numbers, which were later consolidated by the court for trial. Appellant's Brief, at 6.

A three (3) day non-jury trial commenced on April 3, 2014. Appellant was found guilty of all charges and was sentenced on June 20, 2014, to thirty (30) months' to eight (8) years' imprisonment. Trial Court Opinion ("TCO"), 11/7/14, at 1 (unnumbered page). No post-sentence motions were filed by Appellant. *Id.* On August 1, 2014, the trial court issued a scheduling order directing Appellant to file a statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b), within twenty-one (21) days of the date of said order. As the trial court recognized in its 1925(a) opinion, Appellant's 1925(b) statement was untimely filed on September 5, 2014. However, the trial court proceeded with filing a 1925(a) opinion in which it addressed the issues raised by Appellant at length. Because the trial court has addressed the merits of the issues raised on

appeal, we will overlook the waiver of Appellant's claims due to the untimely filing of his 1925(b) statement, based on our authority in **Commonwealth v. Burton**, 973 A.2d 428 (Pa. Super. 2009), where we stated, "if there has been an untimely filing, this Court may decide the appeal on the merits if the trial court had adequate opportunity to prepare an opinion addressing the issues being raised on appeal." **Id.** at 433.

Appellant raises the following questions on appeal for our review:

1. Whether the trial court erred in finding that there was sufficient evidence to convict Appellant of Bad Checks and Theft by Deception arising out of Payroll Checks issued to Mr. Hook and Mr. Smith?

2. Whether the trial court erred in finding that there was sufficient evidence to convict Appellant of Deceptive Business Practices, Theft by Deception, and Theft by Failure to Make Required Disposition of Funds arising out of the Boop home construction contract?

3. Whether the trial court erred in finding that there was sufficient evidence to convict Appellant of Bad Checks for the check issued to Signature Stone?

4. Whether the trial court erred in finding that there was sufficient evidence to convict Appellant of Deceptive Business Practices and Theft by Deception arising out of the Bennett home construction contract?

5. Whether the trial court's sentence structure should be remanded in the event that the controlling sentences on the Boop and Bennett matters are reversed.

Appellant's Brief, at 9.

Before we may address Appellant's issues, we are compelled to note that Appellant failed to properly preserve his sufficiency issues, due to a lack of specificity in his 1925(b) statement. We have previously stated:

[W]hen challenging the sufficiency of the evidence on appeal, … Appellant's 1925 statement must "specify the element or elements upon which the evidence was insufficient" in order to preserve the issue for appeal. Such specificity is of particular importance in cases where … Appellant was convicted of multiple crimes[,] each of which contains numerous elements that the Commonwealth must prove beyond a reasonable doubt.

*Commonwealth v. Gibbs*, 981 A.2d 274, 281 (Pa. Super. 2009) (quoting *Commonwealth v. Williams*, 959 A.2d 1252, 1257 (Pa. Super. 2008)) (citations omitted).

Appellant's 1925(b) statement merely states the following challenge to the sufficiency of the evidence regarding the relevant case numbers: "The verdict was not supported by sufficient evidence." Pa.R.A.P. 1925(b) Statement, 9/5/14, at 1-2 (unnumbered pages). Based on our reasoning in *Williams*, which was reiterated in *Gibbs*, we are compelled to conclude that Appellant's Rule 1925(b) statement is inadequate to preserve his sufficiency claims. Appellant was convicted of multiple offenses, each with multiple elements, yet his Rule 1925(b) statement does not specify which element(s) of his convictions the Commonwealth failed to prove. Instead, Appellant merely states, in boilerplate fashion, under each case number in which he is challenging the sufficiency of the evidence that "[t]he verdict was not supported by sufficient evidence." *Id.* Based on the foregoing, we conclude that Appellant's sufficiency claims are waived.

Nevertheless, even if Appellant had properly preserved the claims he raises herein, we would conclude that the issues are without merit. We have reviewed the certified record, the briefs of the parties, the applicable law,

and the thorough and well-crafted 32-page opinion of the Honorable Louise O. Knight, S.J., of the Court of Common Pleas of Union County, entered November 7, 2014. We conclude that Judge Knight's extensive, well-reasoned opinion accurately disposes of the issues presented by Appellant. Accordingly, had Appellant's claims not been waived, we would adopt Judge Knight's opinion as our own and affirm the judgment of sentence on that basis.

Judgment of sentence affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/26/2015

NOTICE OF ENTRY

FILED
UNION COUNTY, PA

2014 NOV -7 PM 4: 24

PROTHONOTARY
CLERK OF COURTS

COMMONWEALTH OF PENNSYLVANIA : IN THE COURT OF COMMON PLEAS
: OF THE 17TH JUDICIAL DISTRICT
-vs- : OF PENNSYLVANIA
: UNION COUNTY BRANCH
RICHARD TRUMPER, JR., : CRIMINAL DIVISION
Defendant : NO. CP-60-CR-107-2013
: NO. CP-60-CR-108-2013
: NO. CP-60-CR-109-2013
: NO. CP-60-CR-110-2013
: NO. CP-60-CR-111-2013
: NO. CP-60-CR-112-2013
: NO. CP-60-CR-324-2013
: NO. CP-60-CR-30-2014

**OPINION PURSUANT TO PA.R.A.P. 1925(A)**

**Knight, S.J. – November 6, 2014**

In response to the Defendant's "Statement of Issues Complained Of on Appeal"[1] we respectfully submit to the Superior Court the following opinion pursuant to Pa.R.A.P. 1925(a).

**1. Background.**

On April 3, 2014 the Defendant went to trial before the Court on eight different cases. The trial extended over three days – April 3, 4, and 22, 2014. We found the Defendant guilty of all charges. No post-sentence motion was filed. We issued a Scheduling Order directing the Defendant to arrange for the preparation of a trial transcript and to file a Statement of Errors within 21 days

---

[1] The correct term under Pa.R.A.P. 1925(b) is now "statement of errors."

of the date of entry of the Scheduling Order (on August 1, 2014). The Defendant filed an untimely Statement of Errors on September 5, 2014 and by September 19, 2014 record due date in the Superior Court still had not taken steps to order and arrange for the filing of any transcripts. The trial transcripts were finally paid for, lodged and filed on October 2, 2014, and the sentencing hearing transcript was paid for, lodged, and filed on October 13, 2014. We advised the Superior Court of the delays and were told that we should nonetheless proceed to file our 1925(a) Opinion as soon as possible. Thus, we are now submitting our 1925(a) Opinion as soon as we could expeditiously prepare it.

In his 1925(b) Statement the Defendant has raised claims of error in regard to sufficiency of the evidence, amendment of the Information, and sentencing. We respond to the Defendant's claims in this Opinion.

## 2. Sufficiency of the Evidence.

The Defendant has raised a sufficiency of the evidence challenge to several of the cases brought against him. Under Pa. R.Crim.P. 606(A)(7) a defendant may challenge the sufficiency of the evidence for the first time on appeal.

We begin our analysis by setting forth the standard for evaluation of a sufficiency of the evidence claim:

> Our well-settled standard of review when
> evaluating a challenge to the sufficiency of the
> evidence mandates that we assess the evidence and all
> reasonable inferences drawn therefrom in the light

2

most favorable to the verdict-winner. *Commonwealth v. Salamone*, 897 A.2d 1209, 1213 (Pa.Super. 2006) (citation omitted). We must determine whether there is sufficient evidence to enable the fact finder to have found every element of the crime beyond a reasonable doubt. *Commonwealth v. Clark*, 895 A.2d 633, 634 (Pa.Super. 2006) (citation omitted).

In applying the above test, we may not weigh the evidence and substitute our judgment for that of the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. More-over, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Kerry*, 906 A.2d 1237, 1240 (Pa.Super. 2006).

**Case No. CP-60-CR-107-2013 -- Victim Bradley Hook**

The Defendant was charged with, and found guilty of, three offenses in regard to a victim named Bradley Hook: Count 1 – theft by deception, violation 18 Pa.C.S.A. §3922(a)(1); and Counts 2 and 3 – bad checks, violation 18 Pa. C.S.A. §4105(a)(1). Addressing Count 1, a person is guilty of theft by deception if he/she intentionally holds or obtains property by deception. There are three elements to the crime that must be proven by the Commonwealth:

3

(1) That the defendant intentionally withheld property of another;

(2) That the property was the property of another person;

(3) That the defendant created a deception with regard to the property, namely that the defendant obtained or withheld the property by creating or reinforcing a false impression as to law, value or other state of mind. The deception or false impression must be relied upon by the victim.

The evidence showed that the Defendant asked an agent of AFLAC insurance company to visit his business to speak to employees about obtaining insurance through a payroll deduction. Notes of Testimony (hereinafter "N.T.") 4/4/14 at 37. Hook signed the forms necessary to permit the deduction in the amount of $30.66 per paycheck. Commonwealth Exhibit No. 13.2. The deductions began on October 26, 2012 and lasted over approximately four paychecks. In March 2013 and again in June, Hook received letters from AFLAC notifying him that no premium payments had been received in the contract time frame and that therefore, the insurance contract was cancelled, effective November 12, 2012. The letter further advised that a refund check had been sent to the employer. Commonwealth Exhibits No. 13.3. and 13.4. Hook never received any reimbursement from the Defendant for the deductions. The AFLAC agent, Todd Day, testified that AFLAC never received the first month's premium and that later the Defendant attempted to make a last minute payment of the premiums. N.T. 4/4/14 at 57-58. Day tried to reach the Defendant by phone to work out the payment situation so as to save the policies for Hook (and Brett Smith, another employee victim), but had great difficulty reaching him in time, and was initially told by the Defendant that he

4

could not talk to the agent because he had filed for bankruptcy. The premiums not only were late but the Defendant did not send enough money to cover the full amount due. N.T. 4/4/14 at 60. Accordingly, the policy lapsed and any monies paid went by to the Defendant. N.T., 4/4/14 at 64.

The Defendant's explanation was that his intent was to help out his employees and their families by offering the insurance program, that he had no intent to defraud his employees. He also stated that he never got any money back from AFLAC. N.T. 4/4/14 at 196-197.

The Defendant's defense posture throughout the trial was that he was a decent, honorable fellow but a lousy businessman, and that all of the incriminating evidence narrated by the Commonwealth's witnesses was explainable as the result of his poor business decisions. In regard to Hook, he testified that all he wanted to do was help his employees and "their kids." N.T. 4/4/14 at 197.

It should be noted that we found all of the Commonwealth's witnesses to be highly credible, and as to virtually every item of testimony where the Defendant contradicted the witnesses of the Commonwealth to portray himself innocently, we did not find the Defendant credible. In addition, his credibility is affected by the fact that he has prior criminal convictions for felony theft by deception and bad checks. N.T. 4/4/14 at 198 and 199. Pa.R.E. 609(a). While it may be true he started his business with the best of intentions, when he slid into a black hole of cost overruns, his intention turned to self-preservation at any expense. We had no difficulty concluding that the

5

Defendant committed a theft by deception when he failed to make timely payment to AFLAC of the premium monies he took from Hook's paychecks when Hook had the expectation the funds would be sent to AFLAC in a manner to insure that he had a valid contract of insurance.

Counts 2 and 3 of the Hook case involved two payroll checks issued to Hook as an employee of the Defendant. The offense of bad checks requires proof beyond a reasonable doubt of three elements:

(1) That the defendant issued a check in a certain amount;

(2) That the defendant knew that the check would not be honored by the drawee bank;

(3) That the check was of a certain dollar threshold amount specified in the statute (in this case the amount was between $200 and $500).

To summarize the presumptions applicable to this case under 18 Pa. C.S.A. §4105(b), the defendant's knowledge that the check would not be paid when he/she issued it is presumed when payment was refused by the drawee upon the check being presented within 30 days after issuance (an "NSF" stamp establishes a drawee's refusal to pay based on lack of funds); the defendant received notice of the refusal (certified mail permits a finding of notice); and the defendant fails to make good on the check within 10 days after he/she received notice of refusal.

In support of the charges on Counts 2 and 3, Hook testified that the Defendant issued him two payroll checks – one on 11/21/12 and a second on 11/30/11, both of which generated nonsufficient fund letters from his bank within 30 days of each check's issuance. N.T. 4/4/04 at 32. Commonwealth

6

Exhibits 13 and 13.1. Hook confronted the Defendant about the nonpayment. The Defendant promised to "make good" on the checks but did not immediately do so. Hook then sent the Defendant a certified letter about the nonpayment. Although not positive, Hook believed the Defendant contacted him on the eleventh day after he sent the certified letter, and Hook was paid. Hook's lack of certainty was removed by the testimony of Brett A. Smith, another of Defendant's employees, whose bad check narrative mirrored that of Hook.[2] N.T. 4/4/14, at 48. Smith confirmed that both he and Hook followed the same steps of sending the certified letters. Smith testified that the Defendant contacted him and Hook on the tenth day after the letters were sent, and that they met with the Defendant on the eleventh day and were paid.

At trial the Defendant contended that there were two deficiencies in the Commonwealth's evidence. First that the pay checks were not signed by the Defendant, and therefore could not be attributed to the Defendant. The first payroll check was signed by his wife and the second check by the Defendant's brother-in-law. We find this defense to be meritless. The checks were issued for pay due Hook and were marked as payroll checks. The checks bore the Defendant's business name. Hook further testified that the Defendant's wife did all the office paper work and had signed payroll checks in the past. N.T. 4/4/14 at 42. He identified the brother-in-law as the foreman of the business. N.T. 4/4/14 at 42. The Defendant's wife, Debi Trumper, later testified that she ran the Defendant's office and paid the bills. N.T. 4/4/14 at

[2] Brett Smith's case is CP-60-CR-110-2012 and is discussed below.

7

245. She also testified that the brother-in-law had authority to issue checks when the Defendant or she was away from the office for any extended period of time N.T. 4/4/14 at 247.

The Defendant also contends that Hook's testimony was uncertain as to whether he was paid on the eleventh day after the certified letter notice. As we noted above, Smith confirmed the date of the payment as the eleventh day. Additionally, the evidence showed that Smith contacted the Defendant immediately after receiving the bank letters and made the Defendant aware of the lack of funds. N.T. 4/4/14 at 47. Hook testified that he and Smith took their bank letters to the Defendant with the returned checks and went to see the Defendant. N.T. 4/14/14 at 33. Obviously at that meeting the Defendant has "oral" notice that the checks were not honored by the bank, and he did not make good within 10 days of that meeting. The certified letters were sent after that meeting so it is clear that by the time of the tenth or eleventh day after the certified letters were sent, the Defendant had much more than 10 days notice of the nonsufficient funds. We had no difficulty in finding the Defendant guilty of Counts 2 and 3.

**Case No. CP-60-CR-110-2012 – Victim Brett Smith**

This case involved a victim name Brett Smith with charges identical to those involved the victim Brad Hook, discussed immediately above. The proof was the same and the Defendant's defenses the same. For the same reasons as we found the evidence sufficient to convict the Defendant in Hook's case, we made the same finding in Smith's case.

8

## Case No. CP-60-CR-108-2013 – Victim Jonathan Boop

There were three charges against the Defendant: Count 1 – deceptive business practices – sale of less than the represented quantity of services, violation 18 Pa. C.S.A. §4107(a)(2); Count 2 – theft by deception – false impression, violation 18 Pa C.S.A.§3922(a)(1); and Count 3 – theft by failure to make required disposition of funds, violation 18 Pa.C.S.A.§3927(a). We found the Defendant guilty on all three counts. The crime of deceptive business practices has two elements:

> (1) That the Defendant knowingly and intentionally in the course of business offered for sale less than the quantity of services specified;

> (2) That the amount involved of the goods was in excess of a certain dollar amount (as specified in the statute).

The evidence showed that the Defendant was hired by Jonathan Boop to build him a new home, and that the Defendant took as advances from a construction loan some $44,700 for his personal benefit without paying the money to the subcontractors involved in the construction work. The contract document, drafted by the Defendant (Commonwealth Exhibit 3), specified on the first page that RTC Custom Homes would perform all labor necessary for the completion of the specified work. The signature page stated that all payments "are to be determined prior to commencement of work" and that all payments were to be made to the Defendant's business, RTC Custom Homes and Improvement. The payment schedule, Commonwealth Exhibit 3.1, detailed the monies due for each stage of work and stated further that all payments were to be made prior to the commencement of each phase. Thus,

9

clearly the Defendant had contractual responsibility for receipt of all monies and payment of all subcontractors.

The evidence showed that six different subcontractors were not paid the full amount due them. See Commonwealth Exhibit No. 10.[3] Reviewing the evidence in order of the listed subcontractors in the Exhibit, first as to Signature Stone, Jeffrey Hess, President of Signature Stone, testified that he issued his invoice on November 21, 2012 for a total payment of $6,350 with $3,000 to be provided as a down payment. The Defendant's down payment check dated November 13, 2012 was returned for nonsufficient funds on November 29, 2013. N.T. 4/3/14 at 15-17. Upon receiving the bank notice, Hess tried to get hold of the Defendant who was did not return Hess's phone call and made no contact with Hess. The Defendant's phone was shut off. N.T. 4/3/14 at 17. Signature Stone completed all of the stone work by the time of the returned check. On December 3, 2012 Hess sent a certified letter notice to the Defendant of the returned check and demanded payment. Commonwealth Exhibit 1.3 and 1.4. Hess did receive the $3,000 some time in February 2013. But has never received the balance due of $3,350. N.T. 4/3/14 at 21.

Next to testify was Dwayne Gessner, owner of Gessner Excavating. The Boops arranged for Gessner to perform the excavating for their house, but the Defendant told Gessner he would be paying all of the bills. The proposal for work was $25,800. Commonwealth Exhibit No. 2.1. A first bill was paid by the Defendant on August 20, 2012. A second bill was issued for further work on

---

[3] It should be noted that defense counsel stated at trial that the Defendant was not disputing any of the subcontractor claims of nonpayment. N.T. 4/3/14 at 117.

10

August 27, 2012. Commonwealth Exhibit No. 2.2. The bill remained unpaid until October 3, 2012. Commonwealth Exhibit No. 2.3. N.T. 4/3/14 at 29. During the period between August 27 and October 3 Gessner repeatedly tried to get in touch with the Defendant, with no success. He finally found the Defendant at his shop who said he did not have the money to pay Gessner. N.T. 4/3/14 at 30. Another invoice was issued on October 3, 2012 for $11,487.89 which was never paid. N.T. 4/3/14 at 32. An additional bill was issued on November 3, 2012 with accumulated interest. That was not paid. Another billing with additional interest was issued on December 3, 2012. No payment was received. Commonwealth Exhibit No. 2.6. N.T. 4/3/14 at 33. In his efforts to get paid, Gessner had difficulty finding the Defendant. N.T. 4/3/14 at 36.

Allen Long, owner of Al's Drywall, testified that the Defendant contracted with him to the drywall work on the Boop home. Work began in October 2012. The agreement was for Long to be paid one half when work began, and the balance when completed. Although he billed the Defendant on November 8, 2012 for the balance of $2,838.99, he was never paid. Commonwealth Exhibit No. 5; N.T. 4/3/14 at 114-115; testimony of Brenda Long, wife of Allen Long and Al's Drywall office manager, N.T. 4/4/14 at 119.

Steve Miller, the masonry contractor on the Boop home, submitted to the Defendant an estimate of work on July 14, 2012 in the amount of $20,825.10. Although Miller received some money, he never received payment on his final billing dated October 11, 2012 in the amount of $6,068. N.T. 4/3/14 at 122.

11

Like the other subcontractors, he made efforts, for about a week, to reach the Defendant about the unpaid bill. Finally, he reached the Defendant by phone but no payment was forthcoming. N.T. 4/3/14 at 124.

Vic Sprenkel, a partner in Zechman Well Drilling, testified to a similar story. He contracted with the Defendant to drill a well and install a water pump for the Boop home. The well was drilled on September 11, 2012 and a bill issued to the Defendant for $2,527.50 on the same date. Commonwealth Exhibit No. 7. The bill was never paid. Another bill was issued on October 16, 2012 for $1802, after the pump was installed, which was never paid as well. Commonwealth Exhibit No. 7.1. N.T. 4/3/14 at 125-128.

Rodney Gessner, owner of Gessner's Plumbing, testified to his billing problems with the Defendant. He stated that he broke his billing down into four draws of $6,225 each. Commonwealth Exhibit No. 8. The first installment was paid in full. N.T. 4/3/14 at 131. The Defendant was billed for the second installment on September 1, 2012 for $6,225. Commonwealth Exhibit No. 81. A partial payment of $3,500 was received on September 24, 2012. Commonwealth Exhibit No. 8.1. Again the Defendant was billed for the balance and on October 9, 2012 another partial payment of $2,500 was received. Commonwealth Exhibit No. 8.2. A balance of $225 remained. Because Gessner was having trouble getting his full payment from the Defendant, Gessner went to the Defendant and had him sign the initial estimate agreeing to make the payments described on the original estimate. N.T. 4/3/14 at 131. On September 27, 2012 Gessner then billed for the second

12

draw of $6,225. Two checks each in the amount of $3,000 were received from the Defendant on November 14, 2012. One check had a note saying it could be deposited on November 16, 2012 and the other with a note requesting the check be held until November 19, 2012. After depositing per the instructions, one of the checks was returned to Gessner by the bank noting insufficient funds. Commonwealth Exhibit No. 9.3 Gessner sent the Defendant a certified letter notifying him of the insufficient funds. Commonwealth Exhibit No. 9.5. On October 11, 2012 a bill was issued for the third draw upon completion of work - $6,225. Commonwealth Exhibit No. 8.3. No monies were received for that work. N.T. 4/3/14 at 137.

Coupled with the testimony of the unpaid subcontractors was the testimony of Jonathan Boop, the homeowner. He testified to the identity of the various contract documents. Commonwealth Exhibits No. 3 and 3.1; N.T. 4/4./14 at 41-48. Work began on July 2012. Boop explained that the payment schedule process was that the Defendant would let him know when each phase of work was completed, and make a request for payment. The first phase of $75,000 was paid by the Boops before work began. N.T. 4/4/14 at 48. The second phase payment of $75,000 was paid through the construction loan lending bank, West Milton State Bank. Commonwealth Exhibits No.'s 3.2 and 3.3. When it came to payment of Phase 3, the Defendant requested payment of half in advance of the completion of work so he could pay for materials. N.T. 4/4/14 at 50. On October 9, 2012 the Defendant requested payment of the second half of Phase 3. Commonwealth Exhibit No. 3.6. At

13

about that time Dwayne Gessner of Gessner Excavating notified the Boops that he had not been paid for his sand mound work. N.T. 4/4/14 at 52. This was a critical moment because the balance of the Phase 3 money was only to be paid upon completion of the sand mound work. The Boops spoke to the Defendant who assured them that Gessner would be paid. 4/4/14 at 52. The Defendant allayed the Boops concerns by assuring them several times that he was going to make sure every subcontractor would be paid. N.T. 4/4/14 at 53. The Boops authorized the bank to release the second $25,000 upon the Defendant's assurance that Gessner would be paid.

By letter dated October 23, 2012 the Defendant requested a revision of the payment schedule to release one half of the fourth phase payment. Commonwealth Exhibit No. 3.8. Because Gessner had still not been paid, the Boops went to the lending bank on October 23, 2012 for a meeting with the Defendant and the bank officer, Dennis Keefer. N.T. 4/4/14 at 56. At that meeting the Boops and Keefer inquired why Gessner had not been paid. The Defendant's response was to give repeated assurances that Gessner would be paid and that all of the contractors would be paid. N.T. 4/4/14 at 56. At the meeting the Defendant also explained that he wanted the advance on the fourth phase of payment so he could get the stone on the house before the weather turned cold, that he wanted to keep the project moving forward. N.T. 4/4/14 at 57. Boop and Keefer proposed that the bank take the invoice for the stone and pay it directly. The Defendant responded that such an arrangement

14

was not possible because he was the authorized dealer for the stone and only he could buy the stone. N.T. 4/4/14 at 57 and 62.

At the meeting the Defendant insisted that everyone else had been paid up to that point (N.T. 4/4/at 61), a clear lie since several of the contactors had already testified to having not been paid by the Defendant at that point in time – October 23, 2012.

On November 9, 2012 the Defendant submitted another request for payment, calling it the "remainder of the third payment," when in fact it was the balance of the fourth installment. A meeting took place at the bank in regard to the payment request. The Defendant's wife attended, but the Defendant did not because he was on a hunting trip. N.T. 4/4/14 at 63-64.

The Boops became further concerned when there was a slowdown on the work. The Defendant and the workmen were not on the job full time. The Defendant explained that certain supplies and materials had not yet arrived, which puzzled the Boops because the money that had been advanced was to cover the purchase of such supplies and materials and they should have been on site. N.T. 4/4/14 at 67. During the last week of November 2012 the Defendant was not present at the job site at all because he was on a cruise. N.T. 4/4/67. The Boops were particularly concerned because the Defendant had told the Boops that his foreman would be in charge of the project while the Defendant was on his cruise, and the Boops had been given assurances that certain materials and supplies would arrive and the work would move forward. However, nothing was happening as promised. N.T. 4/4/14 at 68. The

15

Defendant was supposed to be back from his cruise and on the job on December 3, 2012. He never showed up. N.T. 4/4/14 at 70. Boop went searching for the Defendant and found him standing out in front of his shop with his foreman and several workers. The Defendant announced that he "was done," that he was not going to be able to finish the house, that he was going out of business and filing for bankruptcy. He offered to let Boop pay his workers and have them work for Boop directly. Boop did not have the money to finish. A multitude of things were unfinished, everything from a lack of a heating system, no countertops for kitchen counters, no fixtures or toilets in the bathrooms, and the flooring was incomplete. Although the stone work was complete, it had not been paid for. N.T. 4/4/14 at 71-73. While the Defendant had been on his cruise, checks to subs began to bounce. The week of December 3, 2012 various vendors stopped by the construction site and told Boop they had not been paid by the Defendant.

Dennis Keefer, Vice President of West Milton State Bank, confirmed Boop's narrative of the meetings with the Defendant. He stated that the payments in the payment schedule (Commonwealth Exhibit No. 3.1) were all advance payments conditioned upon the fact that the work described in a prior payment had been completed. N.T. 4/4/14 at 88. The Defendant fully understood this arrangement. N.T. 4/4/14 at 89.

Keefer reported his account of the meeting when there was a discussion about Dwayne Gessner not having been paid. The Defendant assured the Boops and Keefer that Gessner would be paid. N.T. 4/4/14 at 94. Reluctant

16

to advance monies for the stone work, and offering to pay the contractor directly, the Defendant said that payment had to be to him because he was the "salesperson" for the stone.

All of the monies available through the loan were paid out by January 23, 2013. The house was still incomplete. N.T. 4/4/14 at 100. The bank worked with the Boops to get them additional money to complete the house. N.T. 4/4/14 at 100-104. Keefer stated that had he known that Gessner had not been paid, no additional draw would have been permitted by the bank. N.T. 4/4/14 at 103. But because the Defendant assured the Boops and the bank that Gessner would be paid, the money was released. N.T. 4/4/14 at 104. The Defendant never disclosed that the stone contractor had said that only half the stone had to be paid for in order for it to be delivered. The Defendant represented that all of the stone had to be paid for in advance. N.T. 4/4/14 at 105.

The Defendant testified in contradiction to a number of the Commonwealth witnesses. For example, he stated that Dwayne Gessner was billing before he did any work, not after. N.T. 4/4/14 at 205. The Defendant asserted that at the time of Gessner's invoices on November 3 and December 3 (Commonwealth Exhibits No. 2.5 and 2.6), the Defendant owed nothing to Gessner. N.T. 4/4/14 at 207. He could not recall any bank meeting when the subject of Gessner not being paid came up. N.T. 4/4/14 at 207 and 221. He did not recall ever saying he would pay Gessner. N.T. 4/4/14 at 207-208. He did not recall the bank and the Boops offering to pay Signature Stone directly.

17

N.T. 4/4/14 at 221. He labeled his failure to pay Zechman's Well Drilling was an "oversight," that the invoice must have been misplaced on the office desk. N.T. 4/4/14 at 208. He stated that the Boops made changes in the construction plans which changed the project costs, an allegation denied by the Boops. N.T. 4/22/14 at 42. He asserted that the subcontractors involved in the construction were actually selected by the Boops, and that he (the Defendant) intended to perform most of the work himself. He testified that he had not seen many of the invoices sent by the subcontractors until the end [of his business]; he wasn't in the office; he trusted his wife to take care of things; he wasn't paying attention, he just wanted to finish the house for the Boops. N.T. 4/4/14 at 211-214. He even asserted that under the contract, which he himself drafted, he wasn't being paid to pay his subs; he was being paid "to get the job done." He acknowledged that his business operation "wasn't the most professional job when it came to paperwork." N.T. 4/4/14 at 217-218. He had no answer as to why Al's Drywall did not get paid. N.T. 4/4/14 at 219. He asserted that Jeff Hess of Signature Stone had said his company could not accept direct payment from a homeowner, a statement directly refuted by Jeff Hess on rebuttal. Compare N.T. 4/4/14 at 224 and 4/22/14 at 30.

The Defendant stated that his business began to run out of steam around November 15, 2012. N.T. 4/4/14 at 226. Yet during his imminent business collapse he had time for a hunting trip and a "prepaid" family cruise, out of the country. N.T. 4/4/14 at 219. The Defendant's wife, Debi Trumper, the RTC office manager, stated that all of the bounced check problems began

18

when the Trumper family was away, that before he left they thought there was sufficient money in the bank to pay all bills. N.T. 4/4/14 at 247. She blamed John Todhunter, the RTC foreman, for issuing presigned checks and using the Trumper's bank card. N.T. 4/4/14 at 250.

On rebuttal the Commonwealth's witnesses carved further holes in the Defendant's account. Dwayne Gessner confirmed that he had completed all work before he issued an invoice for payment. N.T. 4/22 at 8-9. Rene Bruhl, a sales employee for Sporoco, Inc.,[4] testified that she had met with the Defendant who was inquiring about buying stone for hand laid stone (loose stone for laying by a mason, for exterior stone on a house, for example). N.T. 4/22/14 at 15-16. She stated that the Defendant never in fact bought stone from Sporoco. Through Ms. Bruhl, the Defendant was introduced to Peter Stoner, a stone mason who happened to be in the warehouse on the day the Defendant came in. Stoner referred the Defendant to Signature Stone as the vendor for the kind of stone the Defendant wanted for the Boop house. N.T. 4/22/14 at 22. This testimony directly contradicted the Defendant's testimony that at the time of the October meeting with the bank, when Keefer and the Boops offered to pay the stone vendor directly, the Defendant said he was not dealing with Signature Stone for stone, and that it was Jeff Hess of Sporoco who had said payment could not come directly from the customer but had to come through the Defendant. Compare N.T. 4/4/14 at 221 (Defendant's testimony) with N.T. 4/22/14 at 29-30 (testimony of Jeff Hess, owner of Signature Stone).

---

[4] The business name is correctly spelled "Sporoco." There are various incorrect spellings appearing in different parts of the record.

19

Jonathan Boop again took the stand and confirmed that the Defendant, indeed, had been made aware that Dwayne Gessner had not been paid, and that the Defendant assured them that Gessner would be paid and that all subs had been paid up to that point. Boop also stated that the Defendant never gave any excuse to the effect that Gessner had not been paid because he had not done the contracted work. N.T. 4/22/14 at 35-36. Boop also elaborated on the fact that when the Boops and the bank offered to pay the stone vendor directly, the Defendant was adamant that the money had to go to him because he was the authorized agent to deal with the stone vendor. N.T. 4/22/14 at 38. Boop also stated that never at any bank meeting or otherwise had the Defendant said he was experiencing cost overruns, that he was "running out of steam" or financial capacity or that he never had enough money to pay the subs. N.T. 4/22/14 at 41. Boop ran through a description of all the work on the house that remained unfinished as of December 3, 2012 when the Defendant told Boop "he was done." N.T. 4/22/14 at 43-48.

As we noted earlier in regard to the Hook and Smith cases discussed above, we found the Defendant's testimony largely incredible and the testimony of the Commonwealth witnesses highly credible and directly in contradiction to the Defendant's narrative. The Defendant portrayed himself as a well-intentioned contractor with lousy business practices. While we agreed that the Defendant was not a good businessman, we found his intentions to be suspect. The Defendant operated a business known as RTC Custom Homes and Improvements and in the course of his business, using his own contract form,

20

made a contract with the Boops by which he represented he would build a house to certain specifications and for a certain price. He contracted with certain subcontractors to do a significant part of the work. The contract stated that per the payment schedule prepared by the Defendant (Commonwealth Exhibit No. 3.1), payment was due on each phase before work began, and that all checks should be made payable to RTC. All of the monies paid out on the construction loan went through the Defendant's hands – some $260,000. His attempt to argue that nowhere in the contract was he required to pay the subcontractors is belied by the contract's terms and by the fact that the contract specified that all monies were to go to the Defendant and did in fact to him. The Defendant's counsel admitted in court that the Defendant did not challenge the fact that the subcontractors claimed by the Commonwealth to be unpaid – were in fact unpaid. The Defendant's duty to pay the subcontractors was clear, and he failed to do so. This evidence satisfied the offense element that he failed to provide less than the services offered.

As far as an intention to deceive is concerned, the Defendant's assurances to the bank and to the Boops in October 2012 that all the subcontractors had been paid was clearly a lie. His faulty memory of the meetings with the bank and the Boops about Dwayne Gessner being unpaid was overridden by the Boop and Keefer testimony. The Defendant's statement to the bank and the Boops that Signature Stone required that they be paid directly by the Defendant was a lie. By the Defendant's own math, he could only account for paying out only about $57,000 of the $260,000 he received.

21

Defendant's Exhibit No. 1. He never breathed a word of having financial difficulty as the bank advanced money to him. When the Boops and the bank expressed concern that Dwayne Gessner had not been paid, the Defendant never spoke up to say, as he did on the witness stand, that Gessner had failed to do the contracted work, clearly evidence of the Defendant's intent to defraud. The advance of monies by the bank and the nonpayment of presented invoices all occurred between September 1 and November 13, timing which does not support the Defendant's portrayal of his business situation. He clearly had the money in his possession by which he could have paid the particular subs in a timely manner. By his own testimony he did not know his business had fallen apart until mid November 2012 so there is no reason he could not have paid the money out to the subcontractors as he received it. Several subs due money described their difficulties in reaching the Defendant and getting paid. See *Commonwealth v. Eline*, 940 A.2d 421, 433-434 (Pa. Super. 2007)(coupled with other factors, the defendant's non-responsiveness to telephone calls and inquiries by victims supports evidence of "intent to deceive"). We also found it highly suspect that the Defendant went on a prepaid family cruise and a hunting trip just before the business crashed. No explanation was ever given by the Defendant as to how he was able to afford such vacations. Even assuming the Defendant was telling the truth, there are incidental expenses for travel – such as airfare, meals etc. - that are incurred prior to and during such a trip. "The trial court is permitted to consider words or conduct or attendant circumstances which the intent to defraud may be inferred." *Commonwealth v.*

22

*Posavek.* 420 A.2d 532, 536 (Pa. Super. 1978). Additionally, proof of criminal intent may be shown by circumstantial evidence. *Commonwealth v. Parker,* 564 A.2d 246, 249 (Pa. Super. 1989). The Defendant's intention to deceive was clearly shown.

The same evidence reviewed above support the Defendant's convictions on Counts 2 and 3 of the Information. Count 2 charged theft by deception-false impression, the elements of which are:

(1) That the defendant intentionally obtained property (money) from the victim;

(2) That the property was property of another person i.e. property in which the defendant had no interest;

(3) That the defendant committed a deception with regard to the property i.e. the defendant obtained the property by intentionally creating or reinforcing a false impression as to the property, which was relied upon by the victim.

As discussed above, the Defendant made false statements to West Milton State Bank and to the Boops in order to induce them to pay over the borrowed money to him on the Boop's construction loan, money which neither the bank nor the Boops would ever have allowed to be paid had they known the truth.

Count 3 accuses the Defendant of theft by failure to make required disposition of funds. The offense elements are:

(1) That the defendant obtained property (money) of another;

(2) That the defendant obtained the property subject to a known legal obligation to make a specified disposition from the property;

(3) That the defendant intentionally dealt with the property obtained as his/her own and failed to make the required disposition.

23

The evidence showed that the Defendant obtained money from West Milton State Bank pursuant to a construction loan taken out by the Boops. By his own contract language the Defendant was obliged to build a house for the Boops and pay the subcontractors involved in the work. Instead the Defendant intentionally kept the money for his own purposes and failed to pay it out as required.

**Case No. CP-CR-109-2013 – Victim Signature Stone**

This case involved a single charge of bad checks. At page 6 above, we set for the elements for the crime of bad checks. In connection with the Boop case above, at page 10 we reviewed the testimony of Jeffrey Hess, owner of Signature Stone regarding the nonpayment of the initial contract deposit check of $3,0000. Additional evidence at trial in regard to the bad check offense was that when the Defendant presented Hess with a check for $3,000 dated November 13, 2012, he asked him to "hold it" until the next day. The check was dated November 13, 2012. Hess did not wait until the next day but rather deposited the check on the same date. The check was returned for nonsufficient funds with a date of November 29. N.T. 4/3/14 at 16. Hess tried to reach the Defendant with no success, and thereafter on December 3, 2012 sent a letter to the Defendant notifying him of the need to make good on the check and also sent the statutorily required certified mail letter. Commonwealth Exhibits No. 1.3 and 1.4. Thereafter Hess received his $3,000 but not within the ten days provided for the statutory presumption of

24

knowledge that the check would not be paid. The balance of $3,350 due under the contract was never received. N.T. 4/3/14 at 21.

The Defendant made much at trial of the fact that Hess did not follow the Defendant's request not to deposit the check until the next day. We think that such a condition is irrelevant to a finding of guilt. The facts showed that the Defendant issued the check in question; it was presented for payment on the same day it was issued, which would have been within 30 days of its issuance; it was returned for nonsufficient funds by the drawee bank; the Defendant had notice of the bank's failure to pay the check; and he failed to make good within ten days of the notice. The presumption of knowledge that the check would not be paid was proven.

### Case No. CP-60-CR-324-2013 – Victim Scott Bennett

The Defendant was charged with deceptive business practices, violation 18 Pa. C.S.A. §4107(a)(2) (Count 1); and theft by deception – false impression, violation 18 Pa. C.S.A. §3922(a)(1)(Count 2). We reviewed the elements of these two offenses in connection with the Boop case – see pages 9 and 23 above. Both charges in the Bennett case arose between September and November 2012, during the same time period as all of the other cases against the Defendant discussed above. The charges accused the Defendant, while operating his construction business, of taking approximately $12,000 with criminal intent from the victim Scott Bennett by promising to perform certain contract work which he never in fact performed.

25

Bennett testified that he found the Defendant's name in the phone book yellow pages and contacted him to do finishing work on his partially constructed house. The contract document, dated September 20, 2012 and prepared by the Defendant, listed the work to be done, which included "finish electrical wiring on 1st floor; install drywall throughout 1st floor; cut up concrete to hook bathroom into lower drain system; finish drywall tape, spackle, sand; install bathroom – 40 x 30 shower, kamode [sic], double sink, vinyl flooring in bathroom." Commonwealth Exhibit No. 15. The total amount quoted by the Defendant was $13,000. On the same date Bennett issued a check for $4,500 before work began. Commonwealth Exhibit No. 15.1. N.T. 4/4/14 at 72-77. The Defendant asked for additional money and Bennett issued a second check for $4,000 on October 2, 2012. At that time the drywall work had been put up but the work was not complete. N.T. 4/4/14 at 80. On November 8, 2012 Bennett wrote out a third check – for $1,000 in response to a phone message left by the Defendant or someone on his behalf in order for work to continue. N.T. 4/4/14 at 81. Bennett left the check on a table in the house. At that point no work was being done on the house. No further work was every done by the Defendant. None of the bathroom fixtures arrived. No plumbing had been installed. Bennett's evidence included a number of photographs showing the unfinished condition of the house. Commonwealth Exhibits No. 16-16.19.

After writing the check on November 8, 2012 Bennett tried to get hold of the Defendant with no luck. No one picked up the phone. N.T. 4/4/14 at 93. Bennett went to the Defendant's shop to look for him but stopped short of

26

going there (apparently because he learned he would not find him there).
Bennett hired another contractor named Tim Karr to perform the work that the
Defendant had contracted to do. N.T. 4/4/14 at 94-95. Karr gave an estimate
to perform the work, excluding that part of the drywall which had already been
done by the Defendant, and the wiring. Karr's estimate was $9,250.
Commonwealth Exhibit No. 15.5.

The Defendant acknowledged that the work for Bennett was not
completed, but he tendered the excuse that "with all the extras that had to be
done" there was insufficient money. N.T. 4/4/14 at 193. The Defendant said
he told Bennett about the extras. He also stated that it was not he who asked
for the additional $1,000 because at the time he was out of town on a hunting
trip. N.T. 4/4/14 at 195. Additionally, one of the Defendant's workers, Jacob
Strouse, reported that he had gone back to the job site for a one week period
and had been trying to get hold of Bennett without success so, he concluded
the Bennett job by doing "the work we felt was worth the final payment we
received, and that point it was a time and material job that it was best if we
would pull off." N.T. 4/4/14 at 234.[5]

On rebuttal Bennett stated neither the Defendant nor any of his
employees ever told him that they could not finish the job for the quoted price
because of cost limitations. N.T. 4/22/14 at 59, 74. All he knew was that he
got a phone message that if he did not pay the additional $1,000, the
Defendant and his workers were not returning. N.T. 4/22/14 at 63. The

---

[5] Strouse had a prior conviction for theft by unlawful taking. N.T. 4/4/14 at 241.

27

check made payable to "RTC" was cashed. N.T. 64. Commonwealth Exhibit No. 15.4. At no time after he abandoned the job, did the Defendant ever offer to make a refund to Bennett.

In the Bennett case the evidence showed that the Defendant received some $12,000 from Bennett and in return got only some minimal drywall work and some minimal wiring work. The bathroom fixtures which were never delivered would have cost $1,266. Completion of the unfinished work by Tim Karr's testimony would have been at least $6,250. So although the Commonwealth could not establish a precise value for what Bennett received from the Defendant, it is reasonable to assume it was the amount involved in the Defendant's deception met a threshold level of $2,000 or more, per the statutory amount. Again the Defendant's defense throughout the cases against him, including the Bennett case, was that he was a bad businessman, did not know how to manage money, and that he had no intent to "steal" from anyone. The requisite criminal intent can be found in the fact that according to Bennett, the Defendant never told him there were cost overruns; that someone on the Defendant's behalf led Bennett to believe another $1,000 amount would allow work to continue but the work never did continue; that after the Defendant abandoned the job, Bennett had trouble getting hold of him. Moreover, all of the events of the Bennett case coincided exactly with the events of the other cases against the Defendant. We hearken back to the points we made earlier – the Defendant was not a credible witness to the Court, and from all of the attendant circumstances and the circumstantial evidence,

28

he was financially desperate and took money from Bennett to keep himself afloat.

### 3. Amendment of the Information.

The Defendant has raised as error the fact that the Court allowed the Commonwealth to amend the Information at trial in the Bennett case – CP-60-CR-324-2013 – to permit Counts 1 and 2 to be graded as felonies of the third degree instead of misdemeanors, based on the dollar amount the Commonwealth expected to prove.

Pa.R.Crim.P. 564 allows for amendment of an information:

> when there is a defect in form, the description of the offense(s), the description of any person or property, or the date charged, provided the information as amended does not charge an additional or different offense. Upon amendment, the court may grant such postponement of trial or other relief as is necessary in the interests of justice.

The law provides that the purpose of the rule is to insure that a defendant is fully apprised of the charges, and to avoid prejudice by prohibiting the last minute addition of alleged criminal acts of which the defendant is uninformed. *Commonwealth v. Mentzer*, 18 A.3d 1200, 1202 (Pa. Super. 2011).

When we asked Defendant's counsel at trial how his client was prejudiced by the amendment, he answered that it affects the penalties and the "entire calculus" of going to trial. N.T. 4/4/14 at 68. We don't find the foregoing to be the kind of prejudice contemplated by the rule. Any defendant going to trial always has to make a "calculus" as to what kind of consequence he/she faces if convicted. As *Mentzer* instructs, the key question to be asked is

29

whether the defendant is fully apprised of the factual scenario which supports the charges against him/her. "Where the crimes specified in the original information involved the same basic elements and arose out of the same factual situation as the crime added by the amendment, [the defendant] is deemed to have been placed on notice regarding his alleged criminal conduct." *Id.* Here the evidence was the same whether a misdemeanor or felony was charged, and the only question was whether the Commonwealth's proof attained a certain dollar amount. Moreover, the "mere possibility that amendment of an information may result in a more severe penalty…is not, of itself, prejudice." *Id.*

### 4. Illegality of Sentence.

In the Hook, Signature Stone, Smith, Bennett, and Sporoco cases the Defendant asserts that the Court abused its discretion in imposing a custodial sentence (top of the guidelines) when a sentence of probation would have provided the Defendant an opportunity to work and pay restitution and support his family, would better comply with the purposes of the Sentencing Code."

A claim that a court abused its discretion can apply only if the Court exceeded the statutory limits or the sentence is manifestly excessive. In order to preserve this claim on appeal, the Defendant must either raise the matter at sentencing or by the filing of a timely motion to modify or reconsider sentence. *Commonwealth v. Trinidad*, 90 A.3d 721, 729 (Pa. Super. 2014). A review of the sentencing transcript does not reveal any contention by the Defendant that

30

the sentence was excessive. The record also shows the Defendant did not file any post-sentence motion on this point. We believe the Defendant has waived the right to challenge the sentence on appeal as an abuse of discretion.

We note for the benefit of the Superior Court, the sentences we imposed upon the Defendant were all within the statutory limits and, therefore, legal. All sentences were within the standard range of the sentencing guidelines. We stated at the sentencing hearing that we took into account the provisions of the Sentencing Code on the general standards of sentencing found at 42 Pa. C.S.A. §9721(b). We presided at the trial and thus had the benefit of hearing all of the evidence. We stated that we reviewed the presentence report and the guideline forms, which satisfies the requirements that we must give reasons for our sentence. *Commonwealth v. Reynolds*, 835 A.2d 720, 734 (Pa. Super. 2003). We considered the victim statements attached to the report, the arguments of counsel, the Defendant's own statement, the character witnesses he provided at trial, and the letters in support of his good character presented at the sentencing hearing. See Sentencing Hearing Transcript, 6/20/14. In short, we followed all of the legal requirements in regard to sentencing and there was no abuse of discretion.

31

## 5. Conclusion.

For the reasons stated, we believe the judgment of sentence should be affirmed.

BY THE COURT:

Knight, S.J.

Copies to: District Attorney
James L. Best, J.D.
Mary F. Leshinskie, J.D., Law Clerk
Judge Knight's file

E-copies to: Hon. Michael T. Hudock, P.J.
Hon. Michael H. Sholley J.
Hon. Harold F. Woelfel, S.J.

PROTHONOTARY-CLERK OF COURTS,
UNION COUTY, PA
CERTIFIED FROM THE RECORD ON THIS DATE

NOV 1 0 2014

BY: Linda Richards
_____, Deputy

32